UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARI MITCHELL,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Case No. 3:05-0705
                                  )    Judge Echols
SIX CONTINENTS HOTELS, INC.       )
d/b/a INTERCONTINENTAL HOTELS     )
GROUP RESOURCES, INC. d/b/a       )
HOLIDAY INN SELECT HOTEL –        )
VANDERBILT,                       )
                                  )
          Defendant.              )

## MEMORANDUM

Pending before the Court are three motions in this employment discrimination case.  In addition to Motions to Strike (Docket Entry Nos. 43 & 45), Defendant Six Continents Hotels, Inc. d/b/a Intercontinental Hotels Group Resources, Inc. d/b/a Holiday Inn Select Hotel–Vanderbilt has filed a Motion for Summary Judgment (Docket Entry No. 26), all of which have been responded to by Plaintiff Mari Mitchell.

## I.  MOTIONS TO STRIKE

Defendant has moved to strike (Docket Entry No. 43) Plaintiff's response to its statement of undisputed material facts (Docket Entry No. 32), claiming Plaintiff has failed to supply appropriate citation to the record as required by the local rules. Defendant has also moved to strike (Docket Entry No. 45) Plaintiff's 36-page, 129-paragraph statement of allegedly undisputed material facts (Docket Entry No. 33).  For her part, Plaintiff claims the length of her statement of facts is necessary

1

given the nature of the case and that her citations in response to Defendant's statement of the facts are appropriate. (Docket Entry Nos. 47 & 49). Both parties claim they are entitled to attorney's fees for the accusations made by the other side about these filings.

This Court has spent unnecessary time in wading through the record and reviewing matters which are collateral to the real issue at hand – whether Plaintiff is entitled to a trial on her claims. It will not waste any further time but observes that a 129-paragraph statement of facts in a case such as this is hardly the "concise statement" contemplated by Local Rule 56.01, and reminds counsel that the purpose of the rule is "to assist the Court in ascertaining whether there are any material facts in dispute[.]" L.R. 56.01(b). Having made those observations, the Motions to Strike will be denied.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Factual Background

At least until February 2005, Plaintiff and Howard Brown ("Brown") were co-workers and good friends. Though not romantically involved, they socialized with some regularity outside of work and would often hug and occasionally peck each other on the cheek upon greeting. (Pf. Depo. at 61). Things changed after Mardi Gras 2005. Unlike Las Vegas, what happened in New Orleans did not stay in New Orleans.

The facts construed in Plaintiff's favor are as follows. Plaintiff and Brown worked as bartenders at Defendant Holiday Inn

Select – Vanderbilt's ("Holiday Inn Select's") restaurant named the Commodore Sports Bar and Grill ("the Commodore"), having previously been co-workers at the Millennium Maxwell House Hotel. Plaintiff first became employed at the Commodore in July, 2002, and asked Brown to join her[1] which he did later that year. (Pf. Depo. at 65-66; Brown Depo. at 30). Each worked approximately four nights per week. (Pf. Depo. at 67; Davis Depo. at 49, 116).

The Commodore typically employed a staff of three bartenders and five servers, with generally two of each working on any given night. The bartender's and server's duties sometimes overlapped and they would assist each other occasionally. (Davis Dep. at 32-37, 44, 125-30; Pf. Depo. at 68). Yogi Davis ("Davis") was the Food and Beverage Manager at the Commodore. Tom Druffel ("Druffel") was the General Manager of Holiday Inn Select. Tonya Crawford ("Crawford") was the Human Resource Director of Holiday Inn Select and she reported to Jeffrey Bermel, the Regional Human Resources Manager for Intercontinental Hotels Group.

Plaintiff and Brown were invited by John Ryan ("Ryan"), Brown's friend and a hotel customer, to attend the 2005 Mardi Gras in New Orleans where Ryan was going to celebrate his 50th birthday and ride on the Orpheus float. (Pf. Depo. at 104). Plaintiff and her husband Greg Bartley ("Bartley") traveled to New Orleans on

---

[1]Initially, Plaintiff was the bar manager or supervisor (she is not sure which) but voluntarily chose to relinquish that position and work as a bartender because she had achieved the goals she wanted as manager and so that her husband could work at the bar. (Pf. Depo. at 46, 52-53).

February 5, 2005, and stayed at the Crowne Plaza Hotel. They were followed a day later by Brown who stayed in a different room at the same hotel. (Bartley Depo. at 34). The trip to New Orleans had absolutely nothing to do with their employment. (Pf. Depo. at 97).

The first couple of days in New Orleans were uneventful, comprised of the typical revelry of Mardi Gras. Plaintiff, her husband, and Brown watched parades, bar-hopped and visited various restaurants. (Pf. Depo. at 98; Bartley Depo. at 37). February 7, 2005 was more of the same, although that evening and early into the morning of the next day Plaintiff attended Harry Connick Jr.'s formal ball at the New Orleans Convention Center at the invitation of Ryan. (Pf. Depo. at 102; Ryan Depo. at 12).

After the ball, Plaintiff, Ryan and Brown went to the Velvet Dog bar in the French Quarter. Plaintiff's husband opted to stay in his hotel room because he and Plaintiff were scheduled to travel back to Nashville at six o'clock in the morning and he wanted to pack. (Bartley Depo. at 47; Ryan Depo. at 13).

The trio arrived at the bar in the early morning on February 8, 2005.[2] While there, Plaintiff exposed her breasts. She claims that she was cajoled and goaded into exposing herself by Brown who stated he had seen every breast in New Orleans except hers, Plaintiff was a prude and frigid, and he asked Plaintiff if she was ashamed of her body. (Pf. Depo. at 107-108). Brown claims

---

[2]The length of time they stayed at the bar is disputed. Plaintiff claims it was about thirty minutes; Brown claims it was a couple of hours.

4

that Plaintiff lowered the top of her black dress after complaining that she did not get the "good beads" because she had not bared her breasts.[3]

Brown roughly touched Plaintiff's bare breasts. (Pf. Depo. at 110-111).[4] Brown also slid his hand along Plaintiff's leg and up her dress.[5]

Plaintiff claims she then hurriedly walked out of the bar and proceeded to run the twelve blocks back to the Crowne Plaza hotel. When she first left the bar, Brown and Ryan followed her and she turned to them and told them to stay away from her and leave her alone. (Pf. Depo. at 114-115).

Plaintiff returned to Nashville with her husband later that morning, intending to leave the episode in New Orleans behind. However, Plaintiff claims that when she returned to work, Brown began to "harass" her. The harassment consisted of (1) Brown talking to others about the event which prompted them to ask Plaintiff for details; (2) making a comment about how her breasts

_____

[3]Brown claims that as Plaintiff exposed herself, the bartender appeared and Plaintiff told the bartender "I hope you don't mind." The bartender responded "no" and in fact claimed she was a little bit jealous because Plaintiff was having two guys fondle her breasts. (Brown Depo. at 63).

[4]The record is unclear as to whether Ryan also touched Plaintiff's breasts. In his deposition he denied it and Plaintiff does not remember him doing so. However, she claims that in a later telephone call he admitted touching her breasts. (Pf. Depo. at 111).

[5]Brown claims he only touched Plaintiff's knee and when she said "no" he stopped. (Brown Depo. at 65).

5

felt; (3) expressing anger and making exaggerated movements; and (4) commenting to other employees that Plaintiff's husband was gay. (Pf. Depo. at 88-91).

In regard to these allegations, Plaintiff states that, shortly after their return, as they were closing the bar, Brown stated there was nothing like the feel of her breasts and they were beautiful. (Pf. Depo. at 133).[6] As for his exaggerated actions and anger, Plaintiff claims after they went back to work, she told Brown their relationship from then on had to be strictly professional. Brown repeatedly expressed his anger thereafter by stomping his feet, making exaggerated movements to avoid Plaintiff behind the bar, and breathing really hard through his nose. (Pf. Depo. at 133-134, 137). Brown's anger frightened Plaintiff, particularly since Brown, a retired police officer, was known to have a gun in his vehicle. (Pf. Depo. at 135).

About a week after their return, February 15, 2005, Marsha Sorensen ("Sorensen") and Christina Williams ("Williams") approached Plaintiff and told her Brown said she had left something out regarding the trip to New Orleans. While Plaintiff had told her co-workers generally about the trip, she did not tell them about the incident at the Velvet Dog, but felt prompted to do so by the inquiry. (Pf. Depo. at 117-119, 130-133). That same night, she told her husband about the episode.

---

[6]Brown claims that Plaintiff expressed embarrassment about exposing her breasts and Brown told her she should not be embarrassed since she had "nice boobs." (Brown Depo. at 72).

6

Around the same time as the discussions with Williams and Sorensen occurred, Plaintiff, Brown, and Davis had a meeting with Crawford about the bartenders having to remove their personal items from public view.[7] Plaintiff did not mention the New Orleans matter at that time. (Pf. Depo. at 124-127).

With regard to reporting the incident to management, Plaintiff first called Davis from home on February 16, 2005, and told him she had a problem with Brown and wanted an immediate schedule change. She did not go into any specifics and Davis told her to wait a few days and see if things would blow over. (Pf. Depo. at 146-147). This was followed by a face-to-face discussion with Davis on February 24, 2005, during which Plaintiff told Davis what happened in New Orleans and Plaintiff was told to report her allegations to human resources. Plaintiff claims she asked for a schedule change which was refused. (Pf. Depo. at 149-153).

Plaintiff met with Crawford on February 28, 2006. After being told what occurred in New Orleans, Brown's subsequent comment about the look and feel of Plaintiff's breasts, and co-workers asking Plaintiff what had happened in New Orleans, Crawford stated that it was sex harassment, that there would be an investigation, and that one or both parties to the sexual harassment would be suspended. (Pf. Depo. at 161-162, 168).

The next day, Crawford spoke with Brown who was incensed by the accusations because he claimed the event in New Orleans was

---

[7]Plaintiff had placed a candle and a picture of her son who was serving in the Army in Iraq on the bar.

consensual. Brown also claimed that Plaintiff was discussing the incident with patrons and co-workers. Crawford told Brown she needed a statement, which he provided a few days later. Brown was suspended for ten days while the investigation proceeded. (Crawford Depo. at 74, Brown Depo. at 85-86).

Crawford investigated further by interviewing Sorensen and Williams, who confirmed that Plaintiff, not Brown, had initiated the discussions about what took place in New Orleans at the Velvet Dog. After confirming that Plaintiff, rather than Brown, had first spoken of the flashing incident in New Orleans, Crawford decided to also suspend Plaintiff pending the investigation.[8] Crawford informed Plaintiff of this action on March 4, 2005, and Plaintiff said she felt she should not be suspended because she was prompted to give details by her co-workers. (Crawford Depo. at 90-94).

During her investigation, Crawford kept Bermel in the loop. He, in conjunction with others at corporate headquarters, was responsible for drafting return-to-work letters to Plaintiff and Brown.

By letter dated March 11, 2005, Brown was informed that he could return to work the following day with the understanding that he was to adhere to the company's Standard of Conduct and conduct himself in a professional manner. Brown was warned that any further actions which could be viewed as sexual harassment on his part could result in discipline, including termination. Brown was

---

[8]Both Brown and Plaintiff ended up being paid during their suspensions.

also reissued the company's policy against harassment. (Crawford Depo. Ex. 20). Shortly after his return, Brown, along with the other hotel employees, were retrained on the company's sexual harassment policy.

In a letter dated March 15, 2005, Plaintiff was informed that the investigation had concluded and that it was unclear that sexual harassment had occurred because the events in New Orleans could be construed as being consensual. Nevertheless, Plaintiff was informed that Brown would be reminded of the sexual harassment policy, warned about future misconduct, and advised to conduct himself in a professional manner. (Crawford Depo. Ex. 21).

With regard to her, Plaintiff was informed that it was unacceptable for her to discuss her workplace concerns with either co-workers or guests. As for her concerns about working with Brown, Plaintiff was told the company would make a good faith effort to schedule their shifts differently, although they could not guarantee she would not work with Brown occasionally. Plaintiff was informed that she could return to work March 15, 2005. (Crawford Depo. Ex. 21).

After receiving her return to work letter, Plaintiff left Crawford's office and went to talk to Davis about her work schedule. Davis allegedly told her that he had been given a "loophole" and that Plaintiff would continue to work three out of four shifts with Brown. (Pf. Depo. at 173). Plaintiff went back to Crawford's office and claims she told Crawford she would do anything to not have to work with Brown, but Crawford told her she

9

needed "to get back on the horse." (Pf. Depo. at 174-175). Regardless, Crawford and Plaintiff went back down to see Davis. Davis denied telling Plaintiff that he would not work with Plaintiff on her schedule, but that he did need her to work that night. Plaintiff stated she could not work that night and Crawford told her she could take a personal day. (Crawford Depo. at 113-114, 121).

Plaintiff went home and allegedly attempted to commit suicide by ingesting bottles of Lortab, Xanax, Mepergan and Vicodin. The mixture of those drugs reportedly rendered her unconscious for two days.

On March 17, 2005, Plaintiff spoke with Bermel by telephone. Bermel allegedly asked Plaintiff in a sarcastic tone what she wanted to change in the return-to-work letter and then told her she had three options. She could return to work under the schedule fixed by Davis, she could quit, or she could take medical leave.

Plaintiff was on medical leave for depression and anxiety-type ailments from March 15, 2005, until August 2006. (Pf. Depo. at 225). While on medical leave, Plaintiff applied for and received short term and long term disability payments. (Bartley Depo. at 1205). She also applied for and received social security disability benefits. In her applications for benefits, Plaintiff claimed she was totally disabled.

**B.  Standard of Review**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for

trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

11

## C. **Legal Analysis**

Plaintiff's claims for allegedly being subjected to a hostile work environment and retaliation are brought under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), T.C.A. § 4-21-101 et seq. Claims under the latter statute are analyzed in the same way as claims under the former. Frizell v. Southwest Motor Freight, 154 F.3d 641, 646-47 (6th Cir.1998); Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn.1996)). For good measure, Plaintiff, in her reply brief, added constructive discharge as a part of her retaliation claim.

### 1. **Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex [.]" 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment'. . . includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 20, 114 S.Ct. 367 (1993).

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment; and 5) the employer failed to take reasonable care to prevent and correct any

sexually harassing behavior." <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 463 (6th Cir. 2000).

In this case, Plaintiff has failed to show either workplace harassment as that phrase has been described by the courts, or that Defendant failed to take appropriate steps to prevent and correct the alleged wrongful behavior.

> a. *Workplace harassment*

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris</u>, <u>supra</u> 510 U.S. at 21. Hence, "not all workplace conduct that has sexual overtones can be characterized as harassment and forbidden by statute." <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822, 825 (6th Cir. 1997).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." <u>Williams v. General Motors</u>, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and a subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive. " <u>Bowman</u>, <u>supra</u>, 220 F.3d at 462. "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the

13

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, when viewed in light of the totality of the circumstances,[9] Plaintiff cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment. Most of the events about which she complains arguably do not relate to her protected status as a female. In this regard, Brown's making exaggerated movements, stomping around, and breathing through his nose suggest more of a dissatisfaction with the souring of his and Plaintiff's relationship rather than harassment because Plaintiff is a female. See, Murphy v. University of Cincinnati, 72 Fed. Appx. 288, 295 (6th Cir. 2003)(a simple personality conflict is not actionable harassment). Other things, such as Brown's alleged statements that Plaintiff's husband is gay and his prompting others to ask Plaintiff what happened in New Orleans may properly be characterized as boorish behavior. However, "merely unpleasant or boorish behavior is not prohibited

_____

[9]The Court rejects Defendant's assertion, supported by citation to a couple of district court cases, that what occurred in New Orleans should not be considered in determining whether Plaintiff was subjected to a hostile work environment. Based upon language in the Supreme Court's decision in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), it has been observed that "[t]he sexual act need not be committed in the workplace . . . to have consequences there . . . But at the very least the harassment must, as in Meritor, be an episode in a relationship that began and grew in the workplace." Doe v. Oberweis Dairy, 456 F.3d 704, 715 (7th Cir. 2006).

by the law, <u>Ptasnik v. City of Peoria</u>, 93 Fed. Appx. 904, 909 (7th Cir. 2004) since "Title VII was not meant to create a 'general civility code[.]'" <u>Clark v. United Parcel Service, Inc.</u>, 400 F.3d 341, 352 (6th Cir. 2005).

The substantial basis for Plaintiff's harassment claim is that Brown touched her breasts (after Plaintiff voluntarily exposed herself) and then her thigh and later commented that her breasts were the best he had seen and felt good. Such limited actions, however, may not constitute sexual harassment because they do not alter the terms and conditions of employment. <u>See</u>, <u>Meriwether v. Caraustar Packaging Co.</u>, 326 F.3d 990, 993 (8th Cir. 2003) (deciding a single incident of grabbing a co-worker's buttock with force near her upper thigh and later joking about the incident "does not rise to the level of severe or pervasive conduct"); <u>Burnett v. Tyco Corp.</u>, 203 F.3d 980, 985 (6th Cir. 2000)("a single battery [placing a pack of cigarettes inside employee's bra] coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment"); <u>Quinn v. Green Tree Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998)(statement that Plaintiff has the "sleekest ass in the office" and intentional touching of her breast with paperwork does not amount to sexual harassment).

To be sure, the touching of an co-worker's breasts is not to be condoned, is offensive, and alone may be sufficient to constitute sexual harassment. <u>See</u>, <u>Worth v. Tyer</u>, 276 F.3d 249,

15

267-68 (7th Cir. 2001)(liability could be established where supervisor touched an employee's "breast near the nipple for several seconds"). However, the Court is to consider a hostile work environment under the totality of the circumstances.

In this case, the circumstances show that Plaintiff voluntarily exposed her breasts, even if she did so upon prompting and under the influence of alcohol she willingly drank. The offensive touching occurred then. After returning to the workplace, the incidents were non-physical, and very limited over a two to three week period. The actions of Brown allegedly consisted of him telling Plaintiff her breasts were nice and felt good, stating her husband was gay, telling others to ask Plaintiff what happened in New Orleans, and stomping and snorting around the bar. The Court finds the totality of the circumstances simply does not suggest Plaintiff was forced to endure a hostile work environment. See, Clark v. United Parcel Service, Inc., 400 F.3d at 351-52 (comparing cases where hostile work environment may be said to exist with those where the evidence showed no such environment).[10] For this reason alone, Defendant is entitled to summary judgment on Plaintiff's harassment claims.

_____

[10]Plaintiff's reliance on Randolph v. Ohio Dept. of Youth Services, 453 F.3d 724 (6th Cir. 2006) is misplaced. In that case, the evidence showed that Plaintiff "was subject to daily threats, derogatory comments, verbal harassment, foul language and several serious physical assaults to which members of the opposite sex were not exposed." Id. at 734.

### b. *Employer liability*

Even if the evidence supported a finding of an abusive working environment, Defendant is entitled to summary judgment because Plaintiff has presented insufficient evidence to hold it liable.

The conduct about which Plaintiff complains has to do with the actions of Brown, a co-worker. In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275 (1998) and <u>Burlington Industries Inc.</u> <u>v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257 (1998), the United States Supreme Court held that where, as here, the alleged harasser is a co-worker, the employer will be liable only if the plaintiff can show the employer knew, or should have known, about the harassment and failed to take appropriate remedial action. <u>Faragher</u>, 524 U.S. at 761-73; 118 S.Ct. at 2292-93; <u>Ellerth</u> 524 U.S. at 761-63; 118 S.Ct. at 2269.

In this case, Plaintiff asserts the Defendant did not take appropriate action when it learned of her complaints regarding Brown. The evidence in the record, however, refutes that contention. Upon hearing of the incident in New Orleans, Defendant

- Interviewed Plaintiff and obtained a detailed statement regarding her allegations;

- Interviewed Brown the very next day and suspended him;

- Obtained a formal written statement from Brown;

- Interviewed the witnesses identified by Plaintiff, Williamson and Sorensen, and obtained written statements from them;

- Issued Brown a formal letter, which was placed in his permanent file addressing his conduct and future interaction with Plaintiff;

17

• Re-issued Brown a copy of the sexual harassment policy and reviewed the policy with him;

• Informed Brown that any future substantiated allegations of harassment and/or retaliatory conduct toward Plaintiff could result in his termination; and

• Provided Brown, as well as the other bar employees, with additional sexual harassment training.

Such activity by the employer amounted to prompt and remedial action appropriate to the circumstances presented to it.

Plaintiff has the burden of showing that Defendant failed to take prompt and effective corrective action once it learned of workplace harassment. <u>Rudd v. Shelby County</u>, 166 Fed. Appx. 777, 778 (6th Cir. 2006). "'The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.'" <u>Collette v. Stein-Mart, Inc.</u>, 125 Fed. Appx. 678, 686 (6th Cir. 2005)(citation omitted). "By doing so, 'the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace.'" <u>Id</u>. Moreover, Defendant had an anti-harassment policy in effect and there is no evidence before the court which would suggest it was not enforced or that the employees were unaware of the policy. <u>Cf</u>., <u>EEOC v. Harbert-Yeargin, Inc.</u>, 266 F.3d 498, 510 (6th Cir. 2001)(a reasonable jury could find in favor of plaintiff where evidence showed, among other things, that the company's harassment policy was not enforced and the employees were unaware that such a policy existed).

18

Plaintiff seeks to muddy the waters by claiming that Davis "flagrantly disregarded" the directive that the company would make good faith efforts to keep Plaintiff from working with Brown by proclaiming he had a "loophole" and then scheduling Plaintiff to work with Brown that night and a couple of other nights that week. This presentation of the facts ignores that Crawford went down to Davis' office with Plaintiff to discuss this matter and also ignores the fact (as will be discussed more fully in the context of Plaintiff's constructive discharge claim) that Davis' alleged proclamation occurred on the same day that Plaintiff opted to take a personal day from which she never returned.

Plaintiff further attempts to cloud the issue by asserting that Defendant did not properly respond to her complaint that Brown could be carrying a gun to work. Again, the record shows the contrary. The record shows Defendant investigated the matter, confronted Brown with the allegations (who denied them), searched his person and his vehicle (which revealed no gun), and obtained a statement from him. Moreover, the relevance of this is not clear because during the time Plaintiff was making her harassment complaints, she never saw Brown with a gun at work and he never threatened her with a gun or otherwise.

When an employer responds to a complaint of harassment, "it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness." Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 873 (6th Cir. 1997). Given the evidence which

19

is contained in the record, the Court holds that a reasonable jury could not find that Defendant exhibited either indifference or permissiveness in relation to the alleged harassment of Plaintiff. Accordingly, Defendant is entitled to summary judgment on Plaintiff's harassment claims under Title VII and the THRA.

   **2.  <u>Retaliation and Constructive Discharge</u>**

In order to establish a *prima facie* case of retaliation under Title VII and the THRA, Plaintiff must show: "(1) she engaged in activity protected by Title VII [or the THRA]; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action." <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." <u>Id</u>. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" <u>Id</u>. at 793 (citation omitted).

Plaintiff asserts three basic grounds of retaliation. First she claims that she was wrongfully suspended by Crawford. However, Defendant has presented a legitimate non-discriminatory reason for

20

this action – gossiping with co-workers – and Plaintiff has not shown this to be pretextual.

An employer can "avoid a finding that its claimed nondiscriminatory reason was pretextual" by "'establish[ing] its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006)(citation omitted). When the employer makes such a showing, "the employee has the opportunity to produce proof to the contrary." Id.

In this case, Defendant has shown a reasonable reliance on facts which supported Plaintiff's suspension for non-discriminatory reasons. At least two employees – Sorensen and Williams – told Crawford that Plaintiff was gossiping about what happened in New Orleans. Plaintiff does not deny talking about the events, her complaint is that she was suspended, while Sorensen and Williams were not. But Plaintiff has wholly failed to show that Sorensen and Williams engaged in substantially similar conduct which would warrant meting out the same punishment. It was Plaintiff who introduced the lurid details about what happened in New Orleans and her allegations about purported improprieties by Brown.

Second, Plaintiff claims retaliation and constructive discharge because Davis decided to schedule Plaintiff and Brown at the same time, notwithstanding what Plaintiff was told in her return to work letter. More than that, "Bermel ratified Davis' conduct by doing nothing about Ms. Mitchell's reports of it other

21

than giving her 'three options' that amounted to constructive discharge." (Docket Entry No. 31 at 34).

Davis' initial scheduling of Plaintiff and Brown on the same shifts and Bermel's offering of three options do not amount to constructive discharge. In <u>Trepka v. Bd. Of Educ. Of Cleveland</u>, 28 Fed. Appx. 455, 460 (6th Cir. 2002) the Sixth Circuit summarized the analysis to be undertaken in cases alleging constructive discharge:

> [Plaintiff's] incantation of the words "constructive discharge," of course, is not sufficient to establish a cause of action because, absent explicit contractual provisions to the contrary, an employer may explicitly discharge any employee at will[.] Rather, conduct that forces an employee to quit, constituting "constructive discharge," is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic. The discriminatory conduct must then make working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.". . .
> Indeed, simple proof of discrimination is not enough to convert an employee's resignation into an actionable constructive discharge. Instead, there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment.

<u>Trepka</u>, <u>supra</u>, 28 Fed.Appx. at 462-63 (internal citations and parenthetical omitted).

In this case, Plaintiff has not shown any discriminatory intent, that the conduct of Defendant made her working conditions so difficult a reasonable employee in her position would have felt compelled to resign, or that there was a continuous and severe practice of discriminatory treatment. Quite the contrary, Defendant promptly investigated her claims and took action it

22

thought appropriate. Even if Davis said that he had a "loophole" and Bermel could be said to have "ratified" that statement, Plaintiff did not remain around long enough to see if, in fact, she would be scheduled an inordinate amount of times with Brown.

"An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged." Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002). "Instead, the employee is obliged 'not to assume the worst, and not jump to conclusions too fast.'" Id. (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)); see also, Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996)(no adverse employment action where plaintiff assigned to new job "failed to make a real attempt to compare the two positions before she filed her discrimination claim.").

Plaintiff did not give the prospect of a new schedule a reasonable try. Instead, upon hearing that she was scheduled to work with Brown she chose not to return to work at all. Effectively, Plaintiff made the choice to resign her position, instead of finding out whether she would, as promised, be allowed to work shifts apart from Brown when the business needs of Defendant permitted. The Court finds, therefore, Plaintiff was not retaliated against in such a way that prompted her constructive discharge.

Finally, Plaintiff claims she was subjected to retaliation because her medical leave was a "sham." In this regard Plaintiff claims she was on medical leave for eighteen months, instead of the

23

standard twelve months, and continued to request that she be scheduled to work outside the presence of Brown after March 18, 2006 but was never given that schedule.

How Defendant can be accused of retaliation in giving Plaintiff preferential treatment in terms of her medical leave (i.e. allowing her to remain an employee) is a mystery. It is also unclear how Defendant can be faulted in not scheduling Plaintiff to work.

After Plaintiff was informed that the hotel would seek to schedule her and Brown's shifts differently to the extent business allowed, Plaintiff informed Bermel that she had attempted suicide, was in a fragile state of mind, and that medical leave was probably the best thing for her. (Pf. Depo. at 221-23). She then did not return to work and represented to the long-term disability carrier and the Social Security Administration that she was unable to work. Since Plaintiff brings no claim under the Americans With Disabilities Act, it is difficult to discern what Defendant should have done to schedule her for work when all it knew was that Plaintiff was totally unable to work any job.

Because Plaintiff cannot show that she was retaliated against or that she was forced to resign, summary judgment is proper on Plaintiff's retaliation/constructive discharge claim.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Defendant Six Continent Hotel Inc.'s Motions to Strike (Docket Entry Nos. 43 & 45) will be

24

denied. Defendant's Motion for Summary Judgment (Docket Entry
No. 26) will be granted and this case will be dismissed.

An appropriate order will be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE